AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>MARTIN MADRIGAL-CAZARES, aka "Evil," LINA FUENTES, EDWIN ANTONIO MORA, JR., aka "Sporty," JAVIER FRANCISCO TAMAYO, aka "Grumpy," DAVID ACOSTA, aka "Shadow," FRANK JOSHUA RUIZ, aka "Villain," ARMANDO MOLINA, aka "Criminal," ROBERT DE LA CERDA, aka "Duke," DANIEL GONZALES, aka "Dapper," RUBEN ANTHONY HERNANDEZ, aka "Lil Boo," aka "Lil Boo Boo," LIBRADO NAVARETTE, aka "Scarface," PHILLIP PAUL GUERRA, aka "Lil Mo," aka "Lil Silent," aka "Danger," ANDRES PEDRO ARRIETA, DANIEL CESAR ARMENDARIZ, aka "Lil Red," DILLON LEE MANSELL, aka "Blanco," ALEJANDRO HERRERA, aka "Conan," and DAVID LEAL, aka "Davey," | DOCKET NO.<br>**13-3000M**<br>MAGISTRATE'S CASE NO.<br> |

| Complaint for violations of Title 21, United States Code, Sections 846 and 841(a)(1); and Title 18, United States Code, Section 2(a). |
|---|

| NAME OF MAGISTRATE JUDGE<br>HONORABLE ANDREW J. WISTRICH | UNITED STATES MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>Beginning on an unknown date and continuing to on or about June 18, 2013 | PLACE OF OFFENSE<br>Ventura County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[21 U.S.C. §§ 846 and 841(a)(1); 18 U.S.C. § 2(a)]

Beginning on an unknown date, and continuing to on or about June 18, 2013, in Ventura County, California, within the Central District of California, defendants MARTIN MADRIGAL-CAZARES, also known as ("aka") "Evil," LINA FUENTES, EDWIN ANTONIO MORA, JR., aka "Sporty," JAVIER FRANCISCO TAMAYO, aka "Grumpy," DAVID ACOSTA, aka "Shadow," FRANK JOSHUA RUIZ, aka "Villain," ARMANDO MOLINA, aka "Criminal," ROBERT DE LA CERDA, aka "Duke," DANIEL GONZALES, aka "Dapper," RUBEN ANTHONY HERNANDEZ, aka "Lil Boo," aka "Lil Boo Boo," LIBRADO NAVARETTE, aka "Scarface," PHILLIP PAUL GUERRA, aka "Lil Mo," aka "Lil Silent," aka "Danger," ANDRES PEDRO ARRIETA, DANIEL CESAR ARMENDARIZ, aka "Lil Red," DILLON LEE MANSELL, aka "Blanco," ALEJANDRO HERRERA, aka "Conan," and DAVID LEAL, aka "Davey," conspired and agreed with each other to knowingly and intentionally distribute methamphetamine in violation of Title 21, United States Code, Sections 846 and 841(a)(1); and each intentionally aiding and abetting the other, knowingly and intentionally possessed with the intent to distribute methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A)(viii), and (b)(1)(B)(viii), and Title 18, United States Code, Section 2(a).

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge.

SIGNATURE OF COMPLAINANT

**TODD HOURIGAN**

OFFICIAL TITLE

Task Force Officer – Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

SIGNATURE OF MAGISTRATE JUDGE[1]

ANDREW J. WISTRICH

DATE

November 15, 2013

[1] See Federal Rules of Criminal Procedure 3 and 54

AUSA Jay H. Robinson x4138      REC: Detention/Arrest Warrant

## AFFIDAVIT

I, Todd Hourigan, being duly sworn, declare and state as follows:

### I.   INTRODUCTION

1.    I am a police officer for the City of Ventura, California.  I have been employed with the Ventura Police Department ("VPD") since January 2003.  I am currently assigned to the Ventura County Multi-Agency Task Force ("VC MAGTF"), which is a federal task force responsible for investigating violent gangs within Ventura County.  The VC MAGTF consists of experienced special agents and gang and narcotics investigators and includes representatives from the FBI, Oxnard Police Department, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and California Department of Corrections and Rehabilitation ("CDCR").  As an investigator with the VC MAGTF, I have received Special Deputation by the Federal Bureau of Investigation ("FBI"), pursuant to Title 21, which authorizes Special Federal Officers ("SFO") to investigate, under FBI supervision, violations of Title 21, and those drug-related violations falling within the FBI's jurisdiction that arise out of an investigation predicated on drug violations.  SFO's do not possess general authority to act as an FBI Special Agent.  I have also received Special Deputation by the United States Marshal's Office pursuant to Title 18, which authorizes SFO's to

participate in FBI investigations outside of their normal jurisdiction. As such, I am authorized by law to conduct investigations and make arrests for offenses enumerated in Title 18, United States Code, Section 2516. Prior to my current assignment, I was assigned to the Ventura Police Department's Special Enforcement Team ("SET") where I maintained that position for approximately five (5) years.

2. In the course of my employment with the Ventura Police Department and the FBI Safe Streets Task Force, I have participated in the arrests of more than 100 persons for firearms, drug related and/or violent offenses, and have assisted in the preparation and execution of over 50 search and arrest warrants for firearms, narcotics and violent crime offenses. My current job assignment includes investigations involving: possession with the intent to distribute and distribution of controlled substances, and conspiracies associated with the foregoing criminal offenses, which are prohibited by Title 21, United States Code, Sections 841(a)(1) and 846; Violent Crimes In Aid Of Racketeering ("VICAR"), which are prohibited by Title 18, United States Code, Section 1959; and Racketeer Influenced and Corrupt Organizations ("RICO") and RICO Conspiracy, which are prohibited by Title 18, United States Code, Sections 1961 and 1962.

3.    I have participated in numerous aspects of criminal
street gang investigations, including the interception of
approximately 100 wire communications, physical surveillance,
and utilization of confidential informants, consensually
monitored telephone conversations, the execution of search
warrants, and the arrest of criminal street gang members.  I
have spoken with defendants, confidential informants, and
witnesses who have extensive knowledge of the inner workings of
criminal street gangs.  Approximately 25 of these investigations
were related to Mexican Mafia matters.  I have also spoken with
experienced gang and narcotics investigators concerning the
methods and practices of criminal street gang members who are
engaged in murder, attempted murder, extortion, assault with a
deadly weapon, and narcotics trafficking.

4.    Additionally, through my investigations, training and
experience, as well as my discussions with other law enforcement
personnel, I have become familiar with the tactics and methods
used by controlled substance traffickers to smuggle and
safeguard controlled substances, to distribute controlled
substances, to collect and launder the proceeds from the sale of
controlled substances, and the clandestine manufacturing of
narcotics.  These tactics and methods include using cellular
telephones, using cloned communication devices, using digital
display paging devices, using debit calling cards, using public

3

pay telephones, using counter surveillance techniques, using false or fictitious identities, and using coded communications and coded words in conversations.

## II.  PURPOSE OF AFFIDAVIT

5.   This affidavit is made in support of an application for a criminal complaint and arrest warrants charging MARTIN MADRIGAL-CAZARES, also known as ("aka") "Evil" ("CAZARES"), LINA FUENTES ("FUENTES"), EDWIN ANTONIO MORA, JR., aka "Sporty" ("MORA"), JAVIER FRANCISCO TAMAYO, aka "Grumpy" ("TAMAYO"), DAVID ACOSTA, aka "Shadow" ("ACOSTA"), FRANK JOSHUA RUIZ, aka "Villain" ("RUIZ"), ARMANDO MOLINA, aka "Criminal" ("MOLINA"), ROBERT DE LA CERDA, aka "Duke" ("DE LA CERDA"), DANIEL GONZALES, aka "Dapper" ("GONZALES"), RUBEN ANTHONY HERNANDEZ, aka "Lil Boo," aka "Lil Boo Boo" ("HERNANDEZ"), LIBRADO NAVARETTE, aka "Scarface" ("NAVARETTE"), PHILLIP PAUL GUERRA, aka "Lil Mo," aka "Lil Silent," aka "Danger" ("GUERRA"), ANDRES PEDRO ARRIETA ("ARRIETA"), DANIEL CESAR ARMENDARIZ, aka "Lil Red" ("ARMENDARIZ"), DILLON LEE MANSELL, aka "Blanco" ("MANSELL"), ALEJANDRO HERRERA, aka "Conan" ("HERRERA"), and DAVID LEAL, aka "Davey" ("LEAL") (hereinafter "the TARGET SUBJECTS") with violating Title 21, United States Code, Section 846: Conspiracy to Distribute Methamphetamine; Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A)(viii), and (b)(1)(B)(viii): Possession With Intent to Distribute Methamphetamine; and Title

4

18, United States Code, Section 2(a): Aiding and Abetting.  This affidavit is also made in support of an application for search warrants of specific locations and items (hereinafter "the SUBJECT PREMISES") for the fruits and instrumentalities of the TARGET SUBJECTS engaging in the charged offenses.  This affidavit, furthermore, is intended to show that there is sufficient probable cause for the requested complaint, arrest warrants, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter.  The statements set forth in this affidavit are based upon my training, education and experience, consultation with experienced law enforcement officers and agents, and other reliable sources of information relative to this investigation.

6.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. SUMMARY OF INVESTIGATION

7.    In or around August 2012, VC-MAGTF Task Force agents and officers began a criminal investigation into the unlawful possession, distribution, and sales of controlled substances and firearms by Ventura County area gang members and associates including the TARGET SUBJECTS.  During the investigation, the TARGET SUBJECTS were identified by law enforcement officials and the CI[1] as being involved in the possession, sale, and distribution of methamphetamine.  As a part of the investigation, law enforcement agents (including myself), directed the CI to conduct controlled buys[2] of methamphetamine directly from RUIZ, MOLINA, ARMENDARIZ, HERRERA, LEAL, MANSELL, AVARRETE and ARRIETA.

---

[1] The CI has participated in several successful undercover operations. Through my direct involvement in this investigation, I know that beginning in July 2012, the CI began providing information to me and other investigators involved in the investigation about the narcotics sales of several Ventura County area criminal street gang members and narcotics dealers. The CI has not worked for any other law enforcement agency, and works for monetary compensation.  The CI's criminal history includes theft of vehicle, felon in possession of a firearm, and second degree robbery.

[2] During a controlled buy, the informant's person is searched by law enforcement to confirm that the informant is free from possessing any illegal controlled substances, contraband, and any unaccounted money.  After the contact with the target the informant is again searched in this manner.

The CI also paid taxes[3] to RUIZ, MOLINA, MORA, GONZALES, TAMAYO, FUENTES, MADRIGAL-CAZARES and DE LA CERDA.  CAZARES, FUENTES, RUIZ, MOLINA, MORA, GONZALES, TAMAYO, and DE LA CERDA were collecting taxes from the CI on behalf of the Mexican Mafia. During the investigation, at the direction of law enforcement officials, including myself, the CI made 12 controlled purchase of narcotics between August 13, 2012 and June 18, 2013:

| Date | Defendants | Quantity/Type |
|------|-----------|---------------|
| August 13, 2012 | MORA NAVARETTE | 112.4 grams of methamphetamine |
| October 26, 2012 | FUENTES RUIZ MOLINA | 55.4 grams of methamphetamine |
| October 29, 2012 | MOLINA GUERRA | 27.7 grams of methamphetamine |
| November 8, 2012 | MOLINA | 55.4 grams of methamphetamine |
| January 4, 2013 | MOLINA | 52.5 grams of methamphetamine |
| January 10, 2013 | ARRIETA | 56.3 grams of methamphetamine |
| February 5, 2013 | ARMENDARIZ | 110.8 grams of methamphetamine |

---

[3] The CI was directed by CAZARES, FUENTES, RUIZ, MOLINA, MORA, GONZALES, TAMAYO, and DE LA CERDA to collect money or "taxes" from known drug dealers that were selling narcotics in the Ventura County area.  The taxes represented a percentage of the narcotics sales price that drug dealers would pay in exchange for CAZARES' permission to sell narcotics within the Ventura County area.

| March 6, 2013 | ARRIETA | 55.3 grams of methamphetamine |
| March 12, 2013 | MOLINA | 56.0 grams of methamphetamine |
| April 12, 2013 | MANSELL | 27.6 grams of methamphetamine |
| April 25, 2013 | HERRERA | 55.3 grams of methamphetamine |
| June 7, 2013 | RUIZ | 20.4 grams of methamphetamine |
| June 18, 2013 | LEAL | 55.7 grams of methamphetamine |

8.   The methamphetamine purchased or seized during each of these transactions was confirmed by the Drug Enforcement Administration ("DEA") Southwest Laboratory through qualitative and quantitative analysis.

9.   Prior to each of these transactions, law enforcement agents provided the CI a specific amount of U.S. currency for the purpose of attempting to purchase controlled substances. While participating in each of the transactions described below, the CI was maintained under constant and/or intermittent visual observation by me and/or other members of VC-MAGTF before, during, and after the controlled investigative narcotics purchases were completed.  During the course of this investigation, the CI had several consensually-recorded and monitored telephone conversations with the several of the TARGET

SUBJECTS.  I have reviewed the recorded telephone conversations, which corroborated the information that the CI provided to me and other law enforcement officials.

10.   During each narcotic transaction described herein, the CI was equipped with a recording device.  Several meetings with the TARGET SUBJECTS occurred at an undercover location (UCO), that was outfitted with CCTV and Audio that was being viewed by Law Enforcement personnel during the meetings.  I have reviewed the recordings made from the recording device used by the CI during this investigation and they corroborate the information provided to me by the CI in regards to the CI's contact with the TARGET SUBJECTS.  I have also reviewed the digital video footage and digital photographs captured by law enforcement officials during the controlled narcotics purchases.  In addition, the recording devices provided real-time transmission of the audio/video recording thereby allowing law enforcement to hear and observe what was occurring as it happened.  My review of these items corroborated the information provided to me by the CI in regards to the CI's narcotics transactions described herein.

11.   <u>Structure of the MADRIGAL-CAZARES Drug Trafficking Organization ("DTO")</u>.  Based on the totality of this investigation, including Title III intercepts between August 2012 and July 2013, as well as my background, training, and

9

experience, I believe CAZARES is the Mexico-based head of the DTO.  From Mexico, defendant CAZARES communicated with FUENTES, MOLINA and RUIZ.  Defendants MOLINA and RUIZ were in control of the narcotic sales and tax collections for CAZARES.

12.  <u>The Ventura County-based distribution network.</u> As a result of this investigation, FBI agents and task force officers determined that CAZARES, FUENTES, MOLINA and RUIZ were controlling the narcotics trafficking throughout Ventura County. CAZARES communicated with FUENTES, MOLINA and RUIZ to distribute narcotics to gang members in Ventura County.  ACOSTA, DE LA CERDA, GONZLAES GUERRA, HERNANDEZ, MOLINA, MORA, NAVARRETE, TAMAYO and RUIZ collected taxes from subjects that were selling narcotics.  FUENTES and CAZARES received the tax proceeds coordinated the distribution of controlled substances to specific locations in Ventura County.

13.  <u>Target Subjects – Identification and Criminal History.</u>

a.  MARTIN MADRIGAL-CAZARES ("CAZARES"): I identified CAZARES based on a comparison of an Oxnard Police Department ("OPD") booking photo to my surveillance observations during this investigation.  I have spoken with the California Department of Corrections and Rehabilitation ("CDCR") and CAZARES is a documented member of the Mexican Mafia with the moniker "EVIL" according to CDCR.

b.   LINA FUENTES ("FUENTES"): I identified FUENTES based on information between the CI and RUIZ.  The CI also deposited money into FUENTES' Citibank account.  FUENTES is married to Mexican CAZARES.

c.   EDWIN ANTONIO MORA, JR. ("MORA"): I identified MORA based on a comparison of his California DMV photo to my surveillance observations during this investigation.  MORA is a documented member of the Moorpark Locals gang and has a gang moniker of "SPORTY."  I have spoken with CDCR and MORA is a documented Mexican Mafia associate according to CDCR.

d.   JAVIER FRANCISCO TAMAYO ("TAMAYO"): I identified TAMAYO based on a comparison of his OPD booking photo to my surveillance observations during this investigation.  TAMAYO is also a documented member of the Sur Town Chiques criminal street gang (the "SXT gang") and has a gang moniker of "Grumpy."  I have spoken with CDCR and TAMAYO is also a documented Mexican Mafia associate according to CDCR.

e.   DAVID ACOSTA ("ACOSTA"): I identified ACOSTA based on a comparison of his OPD booking photo to my surveillance observations during this investigation.  ACOSTA is a documented member of the Squires Drive gang and has a gang moniker of "Shadow."

f.   FRANK JOSHUA RUIZ ("RUIZ"): I identified RUIZ based on a comparison of his California DMV photo to my

surveillance observations during this investigation.  RUIZ is a documented member of the SXT gang with a gang moniker of "Villain."

       g.   ARMANDO MOLINA ("MOLINA"): I identified MOLINA based on a comparison of his California DMV photo to my surveillance observations during this investigation.  MOLINA is a documented associate of the SXT gang with a gang moniker of "Criminal."

       h.   ROBERT ALEX DE LA CERDA ("DE LA CERDA"): I identified DE LA CERDA based on a comparison of his OPD booking photo to my surveillance observations during this investigation. DE LA CERDA is a documented member of the COCH gang and has a gang moniker of "Duke."

       i.   DANIEL JOE GONZALES ("GONZALES"): I identified GONZALES based on a comparison of his OPD booking photo to my surveillance observations during this investigation.  GONZALES is a documented member of the SXT gang and has a gang moniker of "Dapper."

       j.   RUBEN ANTHONY HERNANDEZ ("HERNANDEZ"): I identified HERNANDEZ based on a comparison of his California DMV photograph to my surveillance observations during this investigation.  HERNANDEZ is a documented member of the SXT gang and has a gang monikers of "Lil Boo" and "Lil Boo Boo."

k.    LIBRADO NAVARRETE ("NAVARRETE"): I identified NAVARRETE based on a comparison of his OPD booking photo to my surveillance observations during this investigation.   NAVARRETE is also a documented member of the Lemonwood gang and has a gang moniker of "Scarface."   I have spoken with CDCR and NAVARRETE is also a documented Mexican Mafia associate according to CDCR.

l.    PHILLIP PAUL GUERRA ("GUERRA"): I identified GUERRA based on a comparison of his California DMV photograph to my surveillance observations during this investigation.   GUERRA is also a documented member of the SXT gang and has a gang moniker of "Lil Mo," "Lil Silent," and "Danger".

m.    ANDRES PEDRO ARRIETA ("ARRIETA"): I identified ARRIETA based on a comparison of his Ventura County Sheriff Office booking photo to my surveillance observations during this investigation.   ARRIETA is also a documented associate of the Ventura Avenue Gangsters (VAG).

n.    DANIEL CESAR ARMENDARIZ ("ARMENDARIZ"):   I identified ARMENDARIZ based on a comparison of his California DMV photograph to my surveillance observations during this investigation.   ARMENDARIZ is a documented member of the VAG gang and has a gang moniker of "Lil Red."

o.    DILLON LEE MANSELL ("MANSELL"): I identified MANSELL based on a comparison of his Ventura County Sheriff Office booking photo to my surveillance observations during this

13

investigation.  MANSELL is also a documented member of the VAG gang and has a gang moniker of "Blanco."

p.    ALEJANDRO HERRERA ("HERRERA"): I identified HERRERA based on a comparison of his California DMV photograph to my surveillance observations during this investigation. HERRERA is also a documented member of the East Side Santa Barbara gang and has a gang moniker of "Conan."  I have spoken with CDCR and HERRARA is a documented Mexican Mafia associate according to CDCR.

q.    DAVID LEAL ("LEAL"): I identified LEAL based on a comparison of his California DMV photograph to my surveillance observations during this investigation.  LEAL is also a documented associate of the VAG gang and has a gang moniker of "Davey."

### IV.   PROBABLE CAUSE

14.  MORA, LEAL, and ACOSTA begin to regulate all narcotics sales in Ventura County on behalf of CAZARES.  On August 7, 2012, the CI met with MORA, LEAL and ACOSTA.  MORA was wanted CI-1 to set MORA up with a Methamphetamine supplier.  The CI-1 advised that he/she introduced MORA to LEAL and MORA and LEAL started talking about MORA needing a new source of methamphetamine. LEAL told MORA that he could supply him for $1,200 an ounce. MORA told LEAL that he would get back to him the next day. MORA and LEAL exchanged cell phone numbers.

14

a.   At approximately 9:45 p.m., the CI-1, MORA and LEAL walk out of the residence and back towards the CI-1's vehicle. MORA told the CI-1 to take him to go see David ACOSTA aka "Shadow", from Squires Drive gang in Oxnard. MORA stated that he needed to talk to ACOSTA reference Mexican Mafia related business.

b.   The CI-1 advised that both ACOSTA and the other male who was identified as Danny REYES aka "Lil Travieso", were carrying weapons on their person during the meeting. The CI-1 stated that MORA had set up this meeting without the CI-1's knowledge because it pertained to EME politics. MORA wanted to talk to ACOSTA about the "mesa" and who's "mesa" it was. ACOSTA is working for Michael MORENO aka "Boo Boo" and MORA is working for Martin MADRIGAL-CAZARES aka "Evil". MORA wanted to let ACOSTA that MORA was the person in charge of Ventura County. MORA let ACOSTA read a letter written by MADRIGAL-CAZARES giving MORA permission to run EME business on his behalf. MORA told ACOSTA that he wanted him to be on the "mesa" and control south Oxnard. ACOSTA would be responsible for collecting taxes from the Southside Chiques gang along with Squires Drive gang. ACOSTA said that his right hand man would be REYES. The CI-1 stated that MORA was checking on whether or not there is a "green light" on the entire Southside Chiques gang. The "green light" stems from a homicide that occurred in the Colonia Chiques

15

neighborhood where a Colonia gang member was killed at the hands of a Southside Chiques gang member. The victim of the homicide was related to Armando BARAJAS, a member of the Mexican Mafia, BARAJAS possibly placed the green light on Southside Chiques.

c.    On August 10, 2012, the CI sent MORA $175 by Western Union for taxes that MORA was collecting CAZARES.

d.    On August 10, 2012, at approximately 1:00 p.m., TFO Alinaya received a telephone call from the CI-1 stating that he/she spoke with Edwin "SPORTY" MORA and MORA was asking the CI-1 if he/she had collected the "taxes" from the CI-1's neighborhood.   MORA told the CI-1 that he needed the money today. The CI-1 told MORA that he/she would send MORA the money by Western Union.

15.   August 13, 2012 controlled purchase of 112.4 grams of methamphetamine from NAVARETTE.   On August 13, 2012, at approximately 2:59 p.m., the CI made a recorded telephone call to MORA.   Using coded language during the telephone call, the CI asked MORA if he could sell the CI four (4) ounces of methamphetamine for $2,900.   MORA states, "It shouldn't be a problem" and told the CI he will call NAVARRETE.

a.    Later that day, CI-1 made a recorded telephone call to NAVARRETE, who used coded language to confirm the four-ounce sale of methamphetamine for $2,900.   During the same call, NAVARRETTE agreed to deliver the methamphetamine to the CI.

   b.   At approximately 6:16 p.m., NAVARETTE met the CI
at a commercial parking lot in Ventura, California.  SA Easter
observed and photographed NAVARRETE as he got out of his car
while carrying a clear plastic container with a blue lid and
walked around the front of the CI's car and sat in the front
passenger seat.  After three minutes, NAVARRETE got out of the
CI's vehicle without the clear plastic container in his hands,
and then entered the front passenger side of his car.

   c.   At approximately 6:20 p.m., Detectives Marquez
and Alinaya met with CI-1 and recovered the clear plastic
container that NAVARETTE carried in his hands.  Inside the
container was four one-ounce packages of an off-white substance
that appeared to be packaged methamphetamine.  A subsequent
forensic examination conformed that the substance contained in
the four packages was approximately 112.4 grams of 100% pure
methamphetamine.

   16.   August 25, 2012 MORA collected $150 in narcotics
taxes from the CI on behalf of CAZARES.  On August 25, 2012, at
approximately 12:00 p.m., the CI called me and said that MORA
wanted the CI to get $150 in narcotics taxes from "Maniac," an
unindicted co-conspirator.  MORA said that "Maniac" had the
money and would give the money to the CI to give to MORA.  I met
with the CI and gave the CI $150 to give to MORA.  Later that

evening, the CI met MORA at a restaurant in Camarillo, California, and gave MORA the $150.

17. <u>August 29, 2012, MORA told the CI to deposit $200 into FUENTES' Citibank account for narcotics taxes</u>.  On August 28, 2012, I received a telephone call from the CI who told me that he/she spoke MORA and MORA asked the CI if he/she had collected narcotics taxes from his/her neighborhood.  MORA told the CI that he/she could just deposit the money into a bank account. The CI told MORA that he/she was going to be getting the money tomorrow, August 29, 2012. The CI-1 told MORA that he/she would be getting $150 to $200 on August 29, 2012.  MORA said, "$150 to $200 would be cool."

a.   On August 29, 2012, MORA told the CI that he/she has to deposit the money into a Citibank account number XXXXXXX1253 and told the CI that the name for the account is "FUENTES" ("FUENTES' account").  MORA then told the CI that the CI had to deposit the money before 5:00 p.m.

b.   At approximately 4:30 p.m., SA Easter deposited $200 in the Citibank account provided by MORA to the CI. SA Easter filled out a deposit slip at Citibank with the name FUENTES and the account number.  SA Easter received a receipt from Citibank for this transaction.

18. <u>On September 7, 2012, MORA collected $100 in narcotics taxes from the CI on behalf of CAZARES</u>.  On September 7, 2012,

18

MORA spoke with the CI and asked if he/she had any money for MORA (referring to tax money).  The CI told MORA that he/she had $100 for MORA.  Later that day, MORA met the CI and collected $100 in alleged narcotics taxes from the CI.  Prior to the meeting, I provided $100 to the CI for him/her to give to MORA.

19.  On September 15, 2012, MORA collected $150 in narcotics taxes from the CI on behalf of CAZARES.  On September 14, 2012, MORA called the CI and told the CI to deposit tax money into FUENTES' account.  The CI told MORA that he/she would deposit the money into FUENTES' account on September 15, 2012.

a.  On September 15, 2012, MORA called the CI and told the CI not to deposit the money into FUENTES' account.  Later, MORA personally met the CI in a bookstore parking lot located in Ventura, California and collected $150 from the CI in alleged narcotics taxes.  Prior to the meeting, I provided $150 to the CI for him/her to give to MORA.

20.  On September 22, 2012, TAMAYO told the CI to pay DE LA CERDA $200 in narcotics taxes.  On September 22, 2012, the CI spoke with TAMAYO who asked the CI if he/she had any tax money for TAMAYO.  The CI told TAMAYO that he had $200 in tax money for TAMAYO.  TAMAYO told the CI to meet DE LA CERDA at a hotel located in Oxnard, California and give him the $200.  As TAMAYO instructed, the CI met DE LA CERDA in the hotel parking lot and gave him $200 in purported narcotics taxes.  Prior to the

19

meeting, I provided $200 to the CI for him/her to give to DE LA
CERDA.

      a.   During their meeting, DE LA CERDA told the CI
that CAZARES gave TAMAYO control of narcotics trafficking in
Ventura County because MORA was in custody.

     21.  On September 28, 2012 TAMAYO told the CI to pay
GONZALES $200 in narcotics taxes.  On September 28, 2012, using
coded language in a telephone call, TOMAYO called the CI and
told him/her meet GONZALES at a restaurant in Oxnard so GONZALES
could collect narcotics taxes from the CI.  Later that day, the
CI met GONZALES in the restaurant parking lot paid GONZALES $200
in ostensible narcotics taxes.  Prior to the meeting, I provided
$200 to the CI for him/her to give to GONZALES.

     22.  On October 8, 2012, HERNANDEZ collected $200 from the
CI for narcotics taxes on behalf of TAMAYO.  On October 08,
2012, TAMAYO called the CI and asked if he/she had any tax money
for TAMAYO (referring to Mexican Mafia tax money).  The CI-1
told TAMAYO that he/she would let him know in a few hours.  SA
Easter instructed the CI to call TAMAYO and advise him that the
CI had $200 and would meet TAMAYO later that day at a shopping
center in Oxnard, California.  At approximately 2:50 p.m., the
CI called TAMAYO and agreed to meet him at approximately 4:30
p.m., at the shopping center.

a.    At the designated meeting time, SA Easter saw a light-colored four door sedan stop in front of the shopping center, and a Hispanic male with a shaved head, wearing a black t-shirt and black shorts exited the vehicle and walk into the shopping center and directly towards the CI.  The subject, who was later identified as HERNANDEZ, collected $200 from the CI.

23.    On October 12, 2012, HERNANDEZ collected $200 from the CI for narcotics taxes on behalf of TAMAYO.  On October 12, 2012, using coded language during a telephone conversation, TAMAYO told CI-1 to meet a "runner/gopher" to pay the required narcotics tax.  At approximately 6:56 p.m., the CI-1 met HERNANDEZ in Oxnard, California.  The CI-1 utilized a digital recorder to capture the conversation between HERNANDEZ and the CI-1.  During the meeting, HERNANDEZ also stated that the "tax" money has not been getting to CAZARES.  The CI then handed HERNANDEZ $200 in narcotics taxes that I was provided to the CI prior to the meeting.

24.    On October 18, 2012, the CI met RUIZ, MOLINA and HERNANDEZ to talk about paying taxes and narcotic sales.  On October 18, 2012, the CI met RUIZ, MOLINA, and HERNANDEZ in Ventura, California.  During the meeting, RUIZ asked the CI, "Are you communicating with your varrio? Are they all on deck?" [RUIZ is asking if the CI's gang is paying taxes and willing to

buy narcotics from the "Mesa"].  The CI then affirmed that the
Ventura Avenue gang was on board with paying narcotics taxes.

      a.   The CI told RUIZ that his/her neighborhood is
waiting for "clavo" (drugs).  RUIZ stated that the drugs are in
town and he is just waiting for the phone call to go pick it up.
The CI, RUIZ, MOLINA, and HERNANDEZ all discussed the rule that
they give people "options" - those people who sell drugs can
continue to use their source of supply and pay a "tax" to the
"Mesa" or start purchasing their drugs from the "Mesa" and not
be taxed.

      b.   The CI asked if the EME is sending a drug
connection for the Mesa.  RUIZ stated that MORA, who was then in
custody, was the person who had the drug connection information
but when he was arrested it temporarily disrupted the
distribution.  TAMAYO started to regain the connection and then
he was arrested.  RUIZ stated that TAMAYO gave RUIZ's name to
the EME connection so that they are aware of who will be
conducting the business.

      c.   They all discussed other subjects who are on the
street and claiming to be working for an EME mesa.  RUIZ
explains that he has contact with the "Senora" (i.e., FUENTES)
and if anyone claims to be working for someone else he can call
the FUENTES and she will confirm with the EME.

d.    At approximately 7:18 p.m., the meeting ended and MOLINA, RUIZ, and HERNANDEZ walked out of the meeting location and left the area.

25.    On October 20, 2012, the CI sent MOLINA a $200 Money Gram for taxes that MOLINA was collecting for RUIZ and CAZARES. On October 19, 2012, MOLINA called the CI and asked if the CI had the "taxes" for the FUENTES.  The CI told MOLINA that he/she would get the money to MOLINA tomorrow, October 20, 2012. MOLINA told the CI to put the money transfer under MOLINA's name.

a.    On October 20, 2012, the CI sent MOLINA a $200 Money Gram as payment of narcotics taxes MOLINA was collecting for FUENTES.

26.    On October 24, 2012, the CI met RUIZ and MOLINA to talk about paying taxes and narcotic sales.  At approximately 6:53 p.m. on October 24, 2012, RUIZ and MOLINA met the CI in Ventura, California.  During the meeting, RUIZ told the CI that FUENTES was able to get some methamphetamine for them to sell to the "homies".  RUIZ and MOLINA told the CI that they were just waiting to hear from FUENTES before they started selling it.

a.    RUIZ asked the CI how much the CI would be looking to buy and the CI said "two," referring to two ounces. RUIZ said that he could provide the CI with the two ounces of

methamphetamine on the front as long as the CI gets the money a couple days later and paid either RUIZ or MOLINA.

   b.   RUIZ and MOLINA also talked with the CI about the "taxes" that the CI was responsible for collecting.  RUIZ and MOLINA said that FUENTES wanted $200 every week and whoever buys the methamphetamine from RUIZ or MOLINA needs to pay taxes on the methamphetamine.  The CI told RUIZ and MOLINA that the "homies" that are buying the methamphetamine shouldn't be taxed if they are buying Mexican Mafia drugs. RUIZ and MOLINA agreed with the CI-1 and said they would talk with FUENTES and have her send a message to CAZARES.  RUIZ end the meeting by telling the CI to call him or MOLINA in two days and they will get the two ounces of methamphetamine to the CI.

   27.  On October 26, 2012, MOLINA sold 55.4 grams of methamphetamine to the CI.  On October 26, 2012, using coded language in text messages, the CI asked RUIZ if the two-ounce sale they arranged on October 24, 2012 was still going to happen.  RUIZ replied, "yup."  RUIZ also told the CI that he/she needed to sell the methamphetamine quickly to get the money and pay RUIZ.

   a.   In a separate coded text message to the CI, MOLINA confirmed the sale price for the two ounces was $650 per ounce.  Later that evening, MOLINA met the CI in Ventura, California.  During the meeting, MOLINA provided the CI a two-

24

ounce baggie of a white crystalline substance. The CI collected

the baggie and asked MOLINA the price.  MOLINA said "650 an

ounce."  MOLINA told the CI to get the money to MOLINA after the

CI sold it.

   b. After the meeting, I met the CI and recovered the

baggie from him/her.  A subsequent forensic examination

confirmed that the substance contained in the baggie was

approximately 55.4 grams of 99.4% pure methamphetamine.

   28. <u>On October 29, 2012, MOLINA and GUERRA met the CI and</u>

<u>sold him/her 27.7 grams of methamphetamine, and received $1,500</u>

<u>from the CI as payment for the methamphetamine the CI received</u>

<u>on October 26, 2012</u>.  On October 29, 2012, the CI called MOLINA

to arrange a meeting to pay MOLINA for the two ounces he

provided to the CI on October 26, 2012.  During the same call,

MOLINA asked the CI, "you going to need anything" referring to

purchasing more methamphetamine.  The CI told MOLINA he/she

would check with his homie.  In a subsequent telephone call, the

CI told MOLINA to "bring one" (referring to one ounce of

methamphetamine).

   a. On October 29, 2012, using coded language in a

telephone call, RUIZ told the CI that he talked with FUENTES and

she asked about "the two," referring to the taxes that the CI

pays to RUIZ and MOLINA.  RUIZ also asked the CI about "The

status is with the other stuff?" (referring to the payment for

the two ounces that was sold to the CI on October 26, 2012).
The CI told RUIZ that he/she was taking care of both issues
through MOLINA.

b.    Late that evening, MOLINA and GUERRA met the CI
in Ventura, California.  During the meeting, MOLINA pulled a
blue plastic Tupperware container with a clear lid out of his
front waistband.  MOLINA then opened the plastic container and
pulled a clear plastic baggie containing a white substance.
MOLINA gave the clear baggie with the white substance to the CI.
In exchange, the CI gave MOLINA $1,500 and told MOLINA that
$1,300 was for the two ounces that MOLINA sold to the CI on
October 26, 2012 and $200 was for the taxes.

c.    After the meeting, I recovered the baggie from
the CI.  A subsequent forensic examination confirmed that the
substance contained in the baggie was approximately 27.7 grams
of 100% pure methamphetamine.

29.    On November 2, 2012, RUIZ collected $650 from the CI
for the one ounce of methamphetamine that MOLINA provided the CI
on October 29, 2012.  On October 31, 2012, using coded language
in texts messages, MOLINA told the CI-1 that FUENTES wanted
payment the following day for the one ounce of methamphetamine
MOLINA provided the CI on October 29, 2012.

a.    On November 2, 2012, using coded language in a
text message, MOLINA told the CI to call RUIZ and arrange a

26

meeting so the CI could pay the money the CI owed for the one-ounce methamphetamine sale on October 29, 2012.  The CI then called RUIZ, who asked the CI in coded language if the CI had the money for the October 29 sale.  The CI told RUIZ that he/she would call RUIZ back after he gets the money.

b.    Later that morning, RUIZ met the CI in a shopping center parking lot located in Oxnard, California.  During this meeting, the CI gave RUIZ the $650 and told RUIZ that he/she wanted to get a couple more ounces.  RUIZ told the CI that he was going to be picking up some more tonight or in the next couple days.  RUIZ told the CI that he had talked with FUENTES about selling an ounce for $700 instead of $650.  RUIZ said that if he sells an ounce for $700 to the CI, then the CI won't have to tax the CI's "homies" that are buying from the CI.

30.    On November 8, 2012, MOLINA sold the CI 55.4 grams of methamphetamine.  On November 8, 2012, using coded language in telephone calls, MOLINA arranged to sell the CI two ounces of methamphetamine.  Later that day, MOLINA met the CI in Ventura, California.  At this meeting, MOLINA removed a plastic baggie containing a white crystalline substance from his right front pants pocket and handed the baggie to the CI.  The CI then gave $1,400 to MOLINA.

a.    After the meeting, I recovered the baggie from the CI.  A subsequent forensic examination confirmed that the

substance contained in the baggie was approximately 55.4 grams of 99.8% pure methamphetamine.

31. On January 3, 2013, MOLINA met with the CI to talk about narcotic sales. On January 3, 2013, MOLINA met the CI in Ventura, California. During the meeting, the CI asked MOLINA, "If you want since I'm here just shoot me some," which was the CI's reference to methamphetamine. MOLINA said that he didn't have any right now, but that he could get some to the CI the following morning. The CI then asked MOLINA how much for a "zip", referring to one ounce of methamphetamine. MOLINA said it would be $650.

32. On January 4, 2013, RUIZ and MOLINA sold the CI 52.5 grams of methamphetamine. On January 4, 2013, MOLINA and RUIZ met the CI at a restaurant in Ventura, California. Prior to entering the restaurant, MOLINA provided the CI with a clear plastic bag that contained a white crystalline substance. The CI placed the baggie in his jacket pocket and then gave MOLINA $1,400. Prior to the meeting, I provided the CI $1,400 for this transaction. After counting the money, MOLINA gave $100 back to the CI back because the purchase price was $1,300.

a. After the meeting, I met with the CI and collected the baggie from him/her. A subsequent forensic examination confirmed that the substance contained in the baggie was approximately 52.5 grams of 99.6% pure methamphetamine.

28

33.   <u>On January 10, 2013, ARRIETA sold the CI met with</u>
<u>ARRIETA and purchased 56.3 grams of methamphetamine.</u>   On January
9, 2013, ARRIETA met the CI at a car wash in Ventura,
California.   ARRIETA talked to the CI about selling him/her two
ounces of methamphetamine for $1,300 the following day.

a.   On January 10, 2013, using coded language in a
telephone call, the CI told ARRIETA that he/she had the money to
buy two ounces of methamphetamine.

b.   Shortly after noon, ARRIETA met the CI in the
parking lot of a restaurant located in Ventura, California.
ARRIETA then walked to the CI's car and sat in the passenger
seat.   The CI gave ARRIETA $1,300 in exchange for a baggie
containing a white crystalline substance. ARRIETA then walked
back to his car and drove out of the parking lot.

c.   After the meeting, I recovered the baggie from
the CI.   A subsequent forensic examination confirmed that the
substance contained in the baggie was approximately 56.3 grams
of 99.6% pure methamphetamine.

34.   <u>On February 5, 2013, ARMENDARIZ sold the CI 110.8</u>
<u>grams of methamphetamine.</u>   On January 30, 2013, ARMENDARIZ
offered to sell the CI methamphetamine for $600 an ounce.   On
February 5, 2013, the CI contacted ARMENDARIZ to coordinate a
sale of methamphetamine.   Using coded language in text messages,

the ARMENDARIZ agreed to sell the CI a quarter-pound (four ounces) of methamphetamine.

a.   Later that day, the CI met ARMENDARIZ in Ventura, California.  During the meeting, ARMENDARIZ brought out a pound of methamphetamine in a clear plastic container and then weighed out four separate one-ounce baggies of methamphetamine.  The CI then gave ARMENDARIZ $2,400.  Prior to the meeting, I provided $2,400 to the CI for this transaction.  ARMENDARIZ handed the CI the four plastic baggies and the CI put them in his/her pocket.

b.   After the meeting, I recovered the four baggies from the CI.  A subsequent forensic examination confirmed that the substance contained in the baggies was approximately 110.8 grams of 99.7% pure methamphetamine.

35.   On February 8, 2013, the RUIZ collected $50 in narcotics taxes on behalf of CAZARES.  On February 7, 2013, using coded language in a telephone call, RUIZ asked the CI to get $50 in narcotics taxes for CAZARES.  On February 8, 2013, RUIZ met the CI at a shopping center parking lot in Oxnard, California.  Prior to the meeting, I provided the CI $50 to give to RUIZ as ostensible narcotics taxes.  At the parking lot, the CI got out of his/her car and sat down in the front passenger seat of RUIZ's car.  The CI gave RUIZ the $50 that was provided to the CI-1 by me.  RUIZ told the CI-1 that the $50 was for the CAZARES because he needed it for the canteen.  After the

30

meeting, the CI got out of RUIZ' car and RUIZ exited the parking lot.

36. <u>On March 6, 2013, ARRIETA sold the CI 55.3 grams of methamphetamine</u>.  On March 6, 2013, using coded language in a telephone call, the CI arranged a purchase of two ounces of methamphetamine from ARRIETA.  Later that day, ARRIETA met the CI in Ventura, California.  At the meeting, the CI walked up to ARRIETA's car and sat in the front passenger seat.  The CI gave ARRIETA $1,300 and ARRIETA gave the CI a single plastic baggie containing a white crystalline substance.  The CI then got out of ARRIETA's car and ARRIETA drove away from the meeting location.

a. After the meeting, I recovered the plastic baggie from the CI. A subsequent forensic examination confirmed that the substance contained in the baggie was approximately 55.3 grams of 99.1% pure methamphetamine.

37. <u>On March 12, 2013, MOLINA sold the CI 56.0 grams of methamphetamine</u>.  On March 12, 2013, the CI met MOLINA at MOLINA's residence, which is located in Ventura, California, to buy two ounces of methamphetamine.  Prior to this meeting, I gave the CI $1,300 to buy two ounces of methamphetamine from MOLINA.  The CI provided MOLINA with the $1,300 cash and MOLINA gave the CI a plastic baggie containing a white crystalline substance.  I met the CI after he/she walked away from the

meeting location.  I recovered the plastic baggie from the CI.
A subsequent forensic examination confirmed that the substance
contained in the baggie was approximately 56.0 grams of 100%
pure methamphetamine.

38.  <u>On April 12, 2013, MANSELL sold the CI 27.6 grams of
methamphetamine</u>.  On April 12, 2013, using coded language in a
telephone call, MANSELL agreed to meet the CI and sell the CI an
ounce of methamphetamine.  The CI met MANSELL later that day in
the CI's car, which was parked along West Barnett Street in
Ventura, California.  MANSELL sat in the front passenger seat
and placed a plastic baggie on the center console that contained
a white crystalline substance.  The CI handed MANSELL $700,
which I gave to the CI prior to the meeting for this
transaction.  MANSELL took the money and got out of the CI's
car.  Afterwards, I met the CI at predetermined meet location
and collected the plastic baggie.  A subsequent forensic
examination confirmed that the substance contained in the baggie
was approximately 27.6 grams of 98.5% pure methamphetamine.

39.  <u>On April 25, 2013, HERRERA sold the CI 55.3 grams of
methamphetamine</u>.  On April 25, 2013, using coded language in a
telephone call, the CI called HERRERA and arranged to buy two
ounces of methamphetamine from HERRERA later that day.  At
approximately 1:17 p.m., HERRERA met the CI on a residential
street in Ventura, California.  At the meeting, HERRERA got into

the front passenger seat of the CI's car.  Prior to the meeting,

I gave $1,100 to the CI to buy two ounces of methamphetamine

from HERRERA.  HERRERA then provided the CI-1 with a clear

plastic baggie containing a white crystalline substance.  After

the sale, HEREERA got out of the CI's car and left the meeting

location.  The CI waited for HERRERA to leave the area and then

drove to a predetermined meet location where I met the CI.  I

then recovered the plastic baggie from the CI.  A subsequent

forensic examination confirmed that the substance contained in

the baggie was approximately 55.3 grams of 99.6% pure

methamphetamine.

40.   On June 7, 2013, RUIZ sold the CI 20.4 grams of

methamphetamine.  On June 5, 2013, using coded language in a

telephone call, the CI agreed to buy methamphetamine from RUIZ

the following day.  On June 6, 2013, using coded language in a

text message, the RUIZ agreed to sell the CI two ounces of

methamphetamine the following day.  On June 7, 2013, using coded

language in a telephone call, RUIZ agreed to meet the CI at a

shopping center parking lot located in Oxnard, California to

sell the CI one ounce of methamphetamine.  Later that day, RUIZ

met the CI and got into the front passenger seat of the CI's

car.  RUIZ then handed the CI a plastic baggie containing a

white crystalline substance.  Prior to the meeting, I gave the

33

CI $650 to purchase the one ounce of methamphetamine from RUIZ. The CI used $550 of this money to pay RUIZ.

a.   After this narcotics sale, I met the CI at a predetermined meet location and collected the plastic baggie. A subsequent forensic examination confirmed that the substance contained in the baggie was approximately 20.4 grams of 100% pure methamphetamine.

41.  On June 18, 2013, LEAL sold the CI 55.7 grams of methamphetamine and 26.4 grams of a mixture or substance containing a detectable amount of heroin.  On June 18, 2013, using coded language in a telephone call, the LEAL agreed to meet the CI at a mobile home park in Ventura, California, so he could sell the CI narcotics.  Prior to the meeting, SA Easter gave the CI $2,000 to purchase narcotics from LEAL.

a.   During their meeting, the CI counted the $2,000 in front of LEAL and handed him the money.  In return, LEAL gave the CI the fast food cup containing three plastic baggies: inside two baggies was a white crystalline substance, and inside the third was a congealed black substance.  After the sale, the CI got in her/his car and drove away from the mobile home park.

b.   Thereafter, I met the CI at a predetermined meet location and collected the fast food cup from the CI.  A subsequent forensic examination confirmed that the white substance contained in the first two baggies was approximately

34

55.7 grams of 99.6% pure methamphetamine.  An additional

forensic examination also confirmed that the congealed black

substance contained in the third baggie was approximately 25.4

grams of a mixture or substance containing a detectable amount

of heroin.

### V.    PREMISES TO BE SEARCHED

42.  This affidavit is additionally made to support an

application for search warrants authorizing searches of the

SUBJECT PREMISES for evidence, instrumentalities, and fruits of

violations of the following offenses:

a.    Conspiracy to distribute controlled substances,

in violation of 21 U.S.C. § 846;

b.    Distribution of controlled substances, in

violation of 21 U.S.C. § 841(a)(1);

c.    Maintaining a drug involved premises, in

violation of 21 U.S.C. § 856(a)(1); and

d.    Unlawful use of a communications facility to

facilitate the above-listed offenses, in violation of 21 U.S.C.

§ 843(b) (collectively the "TARGET OFFENSES").

43.  The premises to be searched are locations listed in

ATTACHMENT A of this affidavit, which is incorporated herein by

reference.  The SUBJECT PREMISES include all attached and

unattached rooms, attics, garage and storage areas, safes,

35

lockers, briefcases, bags, containers, trash bags, trash, trash areas and vehicles located on the properties.

44.   As previously stated, I have been employed as a law enforcement officer for more than ten years and have been assigned to an FBI Gang Task Force for the past three years. Through my employment, I have developed a detailed understanding of narcotics conspiracies and related illegal activities including the collection of narcotics trafficking by criminal street gangs and their associates.

45.   Based on my training, experience, discussions with experienced law enforcement officers and agents, discussions with criminal defendants and confidential informants, I know that persons involved in narcotics trafficking commonly keep the ITEMS TO BE SEIZED (described in ATTACHMENT B) at their residences, "stash houses," vehicles, located at their residences or "stash houses", or places of business.

46.   I also know, based on my training and experience, that persons who are engaged in narcotics trafficking, like the TARGET SUBJECTS, as described herein, generally remain in the practice of trafficking in controlled substances and firearms until apprehended by law enforcement and therefore maintain quantities of controlled substances and firearms at their residences, in their vehicles, on their person, and at their places of business.

36

47.   I know from my training and experience that individuals involved in the unlawful trafficking and distribution of illegal controlled substances will often use pagers and cellular phones in the furtherance of their criminal activities.   I know that pagers and cellular phones are used so that distributors of illegal controlled substances and firearms can be reached at any time or location by the purchasers of the controlled substances and firearms, thereby not losing any opportunities for sales due to the inability to be contacted. Also, this precludes the need for distributors to give purchasers their home telephone numbers, thereby decreasing the risks of their identities and residences being discovered by persons who might want to rob them of their unlawful drugs, firearms or monies, and/or any law enforcement official who may be investigating their unlawful activities.

48.   Furthermore, often during the course of searches pursuant to narcotics trafficking search warrants, pagers and cellular phones are found which are functioning and are activated by suspected potential buyers of illegal narcotics and firearms, and that it is necessary to look at the phone numbers displayed on the pager and/or cellular phone, in the furtherance of investigating the unlawful trafficking and distribution activities of the subject(s) of the search warrant.   Therefore,

37

I request that any pagers, cellular phones, and the numbers and contacts contained inside them, be seized as items of evidence.

49.   In this case the TARGET SUBJECTS used cellular telephones to communicate with one and other in furtherance of the TARGET OFFENSES.  As noted above, a monitored and recorded phone call or text message between the CI and the TARGET SUBJECTS preceded each of the 12 controlled narcotics purchases. Thus, based on my training, experience, and knowledge of this investigation, I believe that any cellular telephones or digital devices found at the SUJBECT PREMISES are likely to have evidence of the TARGET OFFENSES.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Based on my knowledge, training, and

experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory

or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

      c.    The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

      d.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive

until it is overwritten by new data.  Therefore, deleted files,
or remnants of deleted files, may reside in free space or slack
space, i.e., space on a hard drive that is not allocated to an
active file or that is unused after a file has been allocated to
a set block of storage space, for long periods of time before
they are overwritten.  In addition, a computer's operating
system may also keep a record of deleted data in a swap or
recovery file.  Similarly, files that have been viewed on the
Internet are often automatically downloaded into a temporary
directory or cache.  The browser typically maintains a fixed
amount of hard drive space devoted to these files, and the files
are only overwritten as they are replaced with more recently
downloaded or viewed content.  Thus, the ability to retrieve
residue of an electronic file from a hard drive depends less on
when the file was downloaded or viewed than on a particular
user's operating system, storage capacity, and computer habits.
Recovery of residue of electronic files from a hard drive
requires specialized tools and a controlled laboratory
environment.  Recovery also can require substantial time.

          e.   Although some of the records called for by this
warrant might be found in the form of user-generated documents
(such as word processing, picture, and movie files), digital
devices can contain other forms of electronic evidence as well.
In particular, records of how a digital device has been used,

                              41

what it has been used for, who has used it, and who has been
responsible for creating or maintaining records, documents,
programs, applications and materials contained on the digital
devices are, as described further in the attachments, called for
by this warrant.  Those records will not always be found in
digital data that is neatly segregable from the hard drive image
as a whole.  Digital data on the hard drive not currently
associated with any file can provide evidence of a file that was
once on the hard drive but has since been deleted or edited, or
of a deleted portion of a file (such as a paragraph that has
been deleted from a word processing file).  Virtual memory
paging systems can leave digital data on the hard drive that
show what tasks and processes on the computer were recently
used.  Web browsers, e-mail programs, and chat programs often
store configuration data on the hard drive that can reveal
information such as online nicknames and passwords.  Operating
systems can record additional data, such as the attachment of
peripherals, the attachment of USB flash storage devices, and
the times the computer was in use.  Computer file systems can
record data about the dates files were created and the sequence
in which they were created.  This data can be evidence of a
crime, indicate the identity of the user of the digital device,
or point toward the existence of evidence in other locations.
Recovery of this data requires specialized tools and a

42

controlled laboratory environment, and also can require
substantial time.

f.    Further, evidence of how a digital device has
been used, what it has been used for, and who has used it, may
be the absence of particular data on a digital device.  For
example, to rebut a claim that the owner of a digital device was
not responsible for a particular use because the device was
being controlled remotely by malicious software, it may be
necessary to show that malicious software that allows someone
else to control the digital device remotely is not present on
the digital device.  Evidence of the absence of particular data
on a digital device is not segregable from the digital device.
Analysis of the digital device as a whole to demonstrate the
absence of particular data requires specialized tools and a
controlled laboratory environment, and can require substantial
time.

g.    Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

50.   I know from my training and experience that
individuals involved in the trafficking and distribution of
illegal controlled substances commonly keep and maintain records
pertaining to their illegal activities.  These include data on
drug quantities and firearms bought and sold customers and

43

criminal associates, drug and firearm debts, and assets obtained

with drug and firearm proceeds and profits.  Such records are

commonly kept at the premises where the drugs are packaged and

sold, and often secured in safes, lock boxes, files, and other

secure or concealed locations not in the immediate vicinity of

the illegal controlled substances and firearms.  These persons

will often keep or maintain drugs, firearms, records and

proceeds in different rooms, buildings, garages, locations, and

vehicles associated with the ongoing criminal enterprise.  This

facilitates easy access for the trafficker and/or distributor of

the illegal controlled substances and firearms, while affording

protection from unwanted discovery.  These records include

ledgers, address books, telephone toll records, notes, messages,

photographs, and video films, indicating drug and firearm sales,

debts, and criminal affiliates.

51.  I know from my training and experience that persons

involved in the manufacturing and/or delivery of illegal

controlled substances often times keep amounts of cash on hand.

This is because of the lucrative nature of the business, the

fact that it is a cash business and the need to accumulate money

in order to re-supply themselves.  It is also necessary to keep

cash on hand to conduct additional transactions, make changes,

and pay drug debts.  As described above, I believe that the

TARGET SUBJECTS, are involved in ongoing distribution of

44

controlled substances and firearms and accept cash for payment,
therefore, it is more likely than not, that cash (money) will be
found at the locations described.

52.  I know from my training and experience that persons
involved in the trafficking and distribution of illegal
controlled substances commonly use packaging materials and
scales to re-package the controlled substances into smaller
quantities to sell to individual purchasers, and that these
packaging materials and scales will be found at the same
location as the controlled substances.  Because the TARGET
SUBJECTS are involved in the trafficking and distribution of
controlled substances, it is more likely than not that packaging
material and scales will be found at the locations.  In
addition, sellers of methamphetamine usually mix methamphetamine
with other substances in order to dilute it and add to its
weight.  I know that substances such as MSM
(Methysulfonylmethane) are sometimes added to methamphetamine.
I know that equipment such as scales, sifters, hammers,
grinders, razor blades, glass panes, mirrors, kilo or pound
presses, heat sealers, heat sealable bags, zip-lock bags, paper
bindles and baggies are needed to prepare controlled substances
including methamphetamine, cocaine and heroin for sale.  I know
that methamphetamine, cocaine and heroin are often mixed and

packaged in the seller's residence, at a stash house, and sometimes in a vehicle.

53.   I know from my training and experience that individuals involved in the trafficking and distribution of illegal controlled substances and firearms often hide narcotics and firearms in many places inside and outside their associated residences, including vehicles, mattresses, safes, inner walls, bathroom fans, outbuildings, garages, gardens, lawns, the ground, and secret compartments.   I am therefore seeking to search all areas of the mentioned premises, and the curtilage therein including any vehicles on the property.   Narcotics traffickers use various locations to serve different functions so that customers, thieves, and law enforcement officers do not learn about any one location where large quantities of narcotics, firearms, money and/or other drug and firearm related assets, are stored.   Therefore, one or more locations, including a vehicle, are often used to store lesser amounts of narcotics, money, and/or drugs, related assets, while additional locations are used to meet customers.

54.   I know from my training and experience that cell phones (and their contents) pagers (and their contents), drug records, packaging material, and weapons (including rifles, shotguns, handguns and ammunition) are tools of the trade and instrumentalities of the crime of manufacturing, delivering, and

trafficking illegal narcotics.  I am therefore seeking to seize these items.

55.  Based on my training and experience, and speaking with law enforcement officials familiar with individuals who traffic in controlled substances, I know that people who sell controlled substances will sometimes use vehicles not registered to them and use multiple addresses for their residences to attempt to thwart police investigations, including the address of relatives.  Based on my training and experience, and speaking with law enforcement officials familiar with individuals who traffic in controlled substances often will not update their address in an effort to disguise their true residences from law enforcement.

56.  Based on my training and experience, I know that people who sell controlled substances, namely criminal street gang members, often possess firearms, ammunition, and related equipment to protect their drugs, drug proceeds and personal possessions purchased with drug proceeds, and to use for purposes of enforcement against rival gang members and drug distributors who may seek to encroach on the gang's territory.

57.  Based on my training and experience, narcotic traffickers maintain books, records, customers lists, receipts, notes, ledgers and other papers, for extended periods of time, relating to the transportation, ordering, sales and distribution

of controlled substances and equipment, even though such documents may be in code.  Traffickers also commonly "front" drugs to their customers, which requires documentation to ensure accurate recording of such transactions.

58.  <u>Evidence linking the TARGET SUBJECTS to the SUBJECT PREMISES</u>.  During this investigation, law enforcement found the following evidence linking the TARGET SUBJECTS to the SUBJECT PREMISES:

a.    <u>ARMENDARIZ'S RESIDENCE</u>.  Located at 320 Franklin Lane, Ventura, California 93001, and is believed to be ARMENDARIZ' residence ("ARMENDARIZ RESIDENCE").  The residence is further described as a single story residence with light green wood and green wood trim, and a gray composite roof.  The residence has a 3' chain link fence around the yard and the number "320" are affixed to the chain link fence in black numbers.  The residence has a brown east facing door.  There is a detached garage that is east of the residence.  I believe the residence to be ARMENDARIZ' residence ("ARMENDARIZ RESIDENCE") based on my review of ARMENDARIZ' California Department of Motor Vehicles ("DMV") driver's license information, which listed ARMENDARIZ'S RESIDENCE as ARMENDARIZ' current residence.  On November 12, 2013, I conducted surveillance at ARMENDARIZ'S RESIDENCE and saw ARMENDARIZ exit 320 Franklin Lane.  I also saw a black 2001 Lincoln, bearing California license plate number

5PNM242, parked in the driveway of ARMENDARIZ' RESIDENCE.  On November 13, 2013, I also reviewed the DMV vehicle registration records of a 2001 Lincoln 4D, bearing California license plate number 5PNM242.  These records listed AREMENDARIZ as the vehicle's registered owner and AREMNDARIZ' RESIDENCE as the vehicle's registered address.

     b.  <u>LEAL'S RESIDENCE</u>.  Located at 246 East Barnett Street, Ventura, California 93001.  The residence is further described as a single story residence with teal stucco exterior and white wood trim, and a gray composite roof.  The residence has a black north facing door and the number "246" are affixed to the white wood trim above the front door in black numbers. There is a detached garage that is south of the residence. There is a motor home that is parked in the drive way west of the residence.  Additionally, there are no other motor homes parked on the property.  I spoke with the CI on November 12, 2013, and the CI confirmed that LEAL is living in the motor home that is parked in the driveway of 246 East Barnett Street, Ventura, California.  On November 11, 2013, I conducted surveillance at 246 East Barnett Street, Ventura, California 93001.  I observed LEAL exit the motor home and get into the driver's seat of a green Toyota Camry, bearing license plate number 6XQN210, which is registered to LEAL ("LEAL's VEHICLE"). As previously stated in this affidavit, LEAL sold the CI 55.7

grams of 99.6% pure methamphetamine and 25.4 grams of a mixture or substance containing a detectable amount of heroin on June 18, 2013.  LEAL drove to this narcotics transaction in LEAL's VEHICLE.

      c.   MOLINA'S RESIDENCE.  Located at 10829 Del Norte Street #3, Ventura, California 93004.  The residence is further described as a two-story condo unit within a multi-unit apartment building with a tan stucco exterior, brown wood trim, and a brown composite roof.  The residence has a brown north facing door and the number "3" is affixed to the door in black numbers.  The name of the apartment complex "Hacienda Villas 10829" is posted on a sign at the entrance of the drive way. Apartment "3" is the third unit on the south side of a row of apartments. As previously stated in this affidavit, MOLINA sold the CI 56.0 grams of 100% pure methamphetamine on March 12, 2013.  The CI met MOLINA for this transaction at MOLINA'S RESIDENCE, 10829 Del Norte Street #3, Ventura, California 93004. On November 12, 2013, the CI spoke with MOLINA inside MOLINA'S RESIDENCE and confirmed the MOLINA was currently living at 10829 Del Norte Street #3, Ventura, California.

      d.   ARRIETA'S RESIDENCE.  Located at 839 Kingfisher Way, Oxnard, California 93030.  The residence is further described as a two-story condo unit within a multi-unit condo building with tan stucco exterior, and a tan tile roof.  The

residence has a teal north facing door and the numbers "839" are affixed to the tan stucco pillars in black numbers.  The name of the apartment complex "California Lighthouse" is posted on a sign outside the south security gate.  I reviewed ARRIETA's DMV information, which listed ARRIETA'S RESIDENCE as ARRIETA's current residence.  On November 11, 2013 I conducted surveillance at 839 Kingfisher Way, Oxnard, California 93030 and observed a black 2006 Chevrolet Silverado, bearing California license plate number 04428E1, which is registered to ARRIETA at ARRIETA'S residence, parked in front of the residence.  On November 13, 2013, I reviewed the DMV vehicle registration records of the 2006 Chevrolet Silverado, bearing California license plate number 04428E1.  These records listed ARRIETA as the vehicle's registered owner and ARRIETA'S RESIDENCE as the vehicle's registered address.

   e. <u>GUERRA'S RESIDENCE</u>.  Located at 1816 North 7th Place, Port Hueneme, California 93003.  The residence is further described as a single story residence with a white stucco exterior and brown wood trim, and a gray composite roof.  The residence has a brown west facing door and the numbers "1816" are affixed to the white stucco north of the front door in black numbers.  On November 4, 2013, Special Agent Easter conducted surveillance and observed GUERRA exit the front door at 1816 North 7th Place, Port Hueneme, California 93003.

f.   RUIZ'S RESIDENCE.   Located at 1411 Casa San

Carlos Lane #A, Oxnard, California 93003.   The residence is

further described as a single-story apartment on the upper level

of a 2-level multi-unit apartment building with tan stucco

exterior, tan wood trim, and a gray composite roof.   Apartment

"A" is on the upper level and the stairs to Apartment "A" are on

the west side of the building.   The residence has a tan west

facing door and a black letter "A" is affixed to the front door.

The numbers "1411" are affixed to the tan wood trim that leads

to the upper level of the apartment building.   On November 11,

2013, I viewed RUIZ' DMV license information, which listed

RUIZ' RESIDNECE as RUIZ' current residence.   On November 11,

2013, I conducted surveillance at RUIZ' RESIDENCE and observed

RUIZ exit RUIZ' RESIDENCE and get into a black 2003 Lexus ES200,

bearing California license plate number 5AHV489, parked in front

of RUIZ'S RESIDENCE.   On November 14, 2013, I reviewed the DMV

vehicle registration records of the black 2003 Lexus ES200,

bearing California license plate number 5AHV489.   These records

listed RUIZ as the vehicle's registered owner and RUIZ'

RESIDENCE as the vehicle's registered address.

g.   HERRERA'S RESIDENCE.   Located at 1757 Ramelli

Avenue, Ventura, California 93003.   The residence is further

described as a single story residence with a gray stucco

exterior and white wood trim, and a gray composite roof.   The

residence has a black east-facing door.  The numbers "1757" are painted in black numbers on the curb line directly in front of the residence.  On November 11, 2013, I was informed that HERRERA is currently on probation.  I contacted Ventura County Probation and learned that HERRERA list the address, 1757 Ramelli Avenue, Ventura, California 93003, as HERRERA'S current residence.  On November 12, 2013, I viewed HERRRERA'S DMV information and learned that HERRERA'S RESIDENCE is listed as HERRERA's current address.

     h.   <u>NAVARRETE'S RESIDENCE</u>.  Located at 3889 Golden Pond Drive, Camarillo 93003.  The residence is further described as a two-story residence with a white stucco exterior, tan wood trim, and a black/gray composite roof.  The residence has a brown west facing door.  The numbers "3889" are affixed to the white stucco exterior in black numbers.  The numbers "3889" are south of the garage door.  On November 11, 2013, I was informed that NAVARRETE is currently on probation.  I contacted Ventura County Probation and learned that NAVARRETE gives the address, 3889 Golden Pond Drive, Camarillo, California, as NAVARRETE's current residence.  On November 12, 2013, I viewed NAVARRETE'S DMV information, which lists NAVARRETE'S RESIDENCE as NAVARETTE's current address.

## VI.   ITEMS TO BE SEIZED

59.   Based on the facts set forth herein, I respectfully submit that there is probable cause to believe that the  listed in Attachment B, which I incorporate herein, constitute evidence, instrumentalities, and fruits of violations of the TARGET OFFENSES and will be found at the SUBJECT PREMISES.

## VII. CONCLUSION

60.   Based on the foregoing facts and opinions, and on my training and experience, I believe there is probable cause to believe that the TARGET SUBJECTS have violated Title 21, United States Code, Section 846: Conspiracy to Distribute Methamphetamine; Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A)(viii), and (b)(1)(B)(viii): Possession With Intent to Distribute Methamphetamine; and Title 18, United States Code, Section 2(a): Aiding and Abetting.

61.   For all of the reasons described above, I believe there is probable cause to believe that evidence, instrumentalities, and fruits of violations of the TARGET OFFENSES, as described above and in Attachment B of this

/// 

/// 

/// 

54

affidavit, will be found in a search of the SUBJECT PREMISES, as further described above and in Attachment A of this affidavit.

_____
Todd Hourigan
Task Force Officer, FBI

Subscribed to and sworn before
me this _____ day of NOVEMBER,
2013.

_____
HONORABLE
UNITED STATES MAGISTRATE JUDGE

55